This cause was heard upon the record in the trial court. Each error assigned has been reviewed and the following disposition is made:
{¶ 1} Appellants, Hope Porter ("Mother") and Manard Porter ("Father"), appeal from the decision of the Summit County Court of Common Pleas, Juvenile Division, which terminated their parental rights to their son, W.P., and awarded permanent custody to the Summit County Children Services Board ("CSB"). We affirm.
 I.
{¶ 2} Mother and Father were married on September 21, 1998, and W.P. is their biological son, born April 13, 2000. Mother was previously involved with CSB when permanent custody of Mother's minor child, B.S., was granted to CSB on April 16, 1999. Father is not the biological father of B.S.
{¶ 3} On April 17, 2000, CSB filed a complaint in the Summit County Court of Common Pleas, Juvenile Division, alleging that the minor child, W.P., was dependent, pursuant to R.C. 2151.04. The juvenile court entered an emergency order of custody, and W.P. was removed from his parents' custody and placed in the custody of CSB. W.P. was four days old at the time of the removal. On May 9, 2000, CSB filed a supplemental affidavit adding an allegation of neglect pursuant to R.C. 2151.03(A). On May 10, 2000, an adjudication hearing was held. The parties stipulated to the finding of dependency, and the allegation of neglect was dismissed without prejudice. At the dispositional hearing held on August 16, 2000, the parties stipulated that placing W.P. in the temporary custody of CSB was in the best interest of the child, and a case plan was adopted.
{¶ 4} On December 19, 2000, CSB moved for permanent custody of W.P. On April 11, 12, and May 22, 2001, the permanent custody hearing was held before a magistrate. The magistrate issued a decision on June 26, 2001. Both Mother and Father filed timely objections to the magistrate's decision. On April 23, 2002, the juvenile court overruled the parties' objections, terminated the parental rights of both Mother and Father, and awarded permanent custody of W.P. to CSB.
{¶ 5} This appeal followed. Mother and Father each appealed, and this Court consolidated the actions. Mother raises three assignments of error, which she addresses together, while Father raises one. Because the assignments of error are interrelated, we will address them together for ease of review.
 II. Mother's Assignments of Error {¶ 6} "THE TRIAL ERRED IN FINDING THAT IT IS IN THE MINOR CHILD'S BEST INTEREST THAT SHE [SIC] BE PLACED IN THE PERMANENT CUSTODY OF CSB AS THE PROSECUTION FAILED TO MEET ITS BURDEN OF PROOF REQUIRING CLEAR AND CONVINCING EVIDENCE[.]"
 {¶ 7} "THE TRIAL COURT ERRED IN GRANTING CSB'S MOTION FOR PERMANENT CUSTODY THEREBY TERMINATING THE PARENTAL RIGHTS OF APPELLANT HOPE PORTER AS THE TRIAL COURT'S FINDINGS ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE WHICH COULD ONLY LEAD TO ONE CONCLUSION THAT BEING CONTRARY TO THE JUDGMENT OF THE TRIAL COURT[.]"
 {¶ 8} "THE TRIAL COURT ERRED IN GRANTING CSB'S MOTION FOR PERMANENT CUSTODY AS APPELLANT HOPE PORTER SUBSTANTIALLY COMPLIED WITH HER CASE PLAN REQUIREMENTS."
 Father's Assignment of Error {¶ 9} "THE JUVENILE COURT'S AWARD OF PERMANENT CUSTODY TO THE CHILDREN SERVICES BOARD IS NOT IN THE BEST INTERESTS [SIC] OF THE CHILD, IS NOT SUPPORTED BY CLEAR AND CONVINCING EVIDENCE, AND IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."
{¶ 10} In their assignments of error, both Mother and Father assert that the order awarding permanent custody of W.P. to CSB was not supported by clear and convincing evidence, was not in the best interest of the child, and was against the manifest weight of the evidence. Mother further alleges that the trial court erred when it granted permanent custody to CSB because she substantially complied with her case plan. We disagree.
{¶ 11} When evaluating whether a judgment is against the manifest weight of the evidence in a juvenile court, the standard of review is the same as that in the criminal context. In re Ozmun (Apr. 14, 1999), 9th Dist. No. 18983, at 3. In determining whether a criminal conviction is against the manifest weight of the evidence:
 {¶ 12} "[t]he court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." State v. Thompkins (1997), 78 Ohio St.3d 380, 387, quoting State v. Martin (1983), 20 Ohio App.3d 172, 175.
{¶ 13} "[E]very reasonable presumption must be made in favor of the judgment and the findings of facts [of the trial court]." Karches v.Cincinnati (1988), 38 Ohio St.3d 12, 19. Furthermore, "if the evidence is susceptible of more than one construction, we must give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the [juvenile] court's verdict and judgment." Id. Accordingly, before an appellate court will reverse a judgment as being against the manifest weight of the evidence, the court must determine whether the trier of fact, in resolving evidentiary conflicts and making credibility determinations, clearly lost its way and created a manifest miscarriage of justice.
{¶ 14} Termination of parental rights is an alternative of last resort but is sanctioned when necessary for the welfare of a child. In reWise (1994), 96 Ohio App.3d 619, 624. Before terminating parental rights and awarding a moving agency permanent custody of a child, who is neither abandoned nor orphaned, the juvenile court must find clear and convincing evidence of both prongs of the statutory test: (1) that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent or that the child has been in the temporary custody of the agency for more than twelve of the last twenty-two months and (2) that the grant of permanent custody to the agency is in the best interest of the child, based on an analysis under R.C. 2151.414(D). See R.C. 2151.414(B)(1). Clear and convincing evidence is that which will produce in the trier of fact "`a firm belief or conviction as to the facts sought to be established.'" In re Adoption of Holcomb (1985),18 Ohio St.3d 361, 368, quoting Cross v. Ledford (1954), 161 Ohio St. 469, paragraph three of the syllabus.
{¶ 15} Concerning the first prong of the statutory test, when determining whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents, the court, in considering all relevant evidence, must determine by clear and convincing evidence that one or more of the enumerated factors set forth in R.C. 2151.414(E) exists as to each parent. R.C. 2151.414(E). If the court finds that any of the enumerated conditions is present or occurred in the case, the court must enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with the parents. In re Higby (1992), 81 Ohio App.3d 466, 468.
{¶ 16} In this case, the juvenile court cited the following factors enumerated in R.C. 2151.414(E) concerning whether the child cannot be place with either parent within a reasonable time or should not be placed with the parents:
 {¶ 17} "(1) Following the placement of the child outside the child's home * * *, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.
 {¶ 18} "(2) Chronic mental illness, chronic emotional illness, mental retardation, physical disability, or chemical dependency of the parent that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year after the court holds the hearing pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code;
 {¶ 19} "(11) The parent has had parental rights involuntarily terminated * * * with respect to a sibling of the child[;]
 {¶ 20} "(16) Any other factor the court considers relevant."
{¶ 21} As to the second prong, in determining whether a grant of permanent custody is in the child's best interest, the juvenile court must:
 {¶ 22} "consider all relevant factors, including, but not limited to, the following:
 {¶ 23} "(1) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
 {¶ 24} "(2) The wishes of the child, as expressed * * * through the child's guardian ad litem[;]
 {¶ 25} "(3) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999;
 {¶ 26} "(4) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
 {¶ 27} "(5) Whether any of the factors in divisions (E)(7) to (11) of [R.C. 2151.414] apply in relation to the parents and child." R.C. 2151.414(D)(1)-(5).
{¶ 28} Although the trial court is not precluded from considering other relevant factors, the statute explicitly requires the court to consider all of the enumerated factors.
{¶ 29} Witnesses who testified at the permanent custody hearing included Dr. Ann Hickin, a licensed psychologist at Northeast Ohio Psychological Associates (NEOPA); Lora Paisley, a nurse the rapist at Portage Path Behavioral Health; Donna Abbott, a pediatric nurse practitioner at Children's Hospital Medical Center of Akron; Elizabeth Harrison; Marsha Morlan, W.P.'s foster caregiver; Stephen Hertrick, Mother and Father's previous landlord; Margaret Campbell, a CSB case aide; William Cardina, a CSB social worker; Manard Porter, I., Father's father and W.P.'s grandfather; Linda Simms, Mother's sister; Mother; and Father.[1] Sharon Sciartelli, W.P.'s guardian ad litem, presented her report. The testimony revealed the following.
{¶ 30} Dr. Hickin met with Mother and Father each approximately five times. She conducted various intelligence tests and performed psychological and parenting evaluations. Dr. Hickin testified that Mother scored in the low-average range of intellectual functioning and has problems applying what she has learned. Mother suffers from chronic mental illness and has some hearing loss. The test results indicated depression, a cynical viewpoint, a tendency to ignore the advice of others, and impulsiveness. However, the results also indicated a willingness to look at the positive aspects of life and the negative aspects of self in proportion. Although Mother performed well on daily living skills, she exhibited problems with socialization skills.
{¶ 31} Dr. Hickin diagnosed Mother as having a personality disorder "Not Otherwise Specified with Narcissistic and Dependent Features." Dr. Hickin explained that Mother needs a lot of reinforcement of self worth, affection, and attractiveness, and she tends to become involved in relationships in which she is dependent on others, which could lead Mother to place herself in dangerous situations. Dr. Hickin also testified that Mother does not take responsibility for her actions; for instance, Mother indicated that the termination of her parental rights to her first child was not Mother's fault.
{¶ 32} There are reports of domestic violence occurring in the house, including an instance of domestic violence in the couple's home less than two weeks after CSB was granted permanent custody of B.S. and Mother's parental rights were terminated with respect to that child. Father was convicted of domestic violence in March, 1999. Mother does not perceive the domestic violence occurring in the home as others interpret it. In reference to the circumstances leading to Father's conviction of domestic violence, Mother denied having any bruises, which causes concern for Dr. Hickin because Mother does not perceive the situation at home as being dangerous.
{¶ 33} Mother told Dr. Hickin that she and Father argued everyday about Father's dislike of the way Mother dresses and styles her hair. Mother indicated that she felt Father was controlling her. Dr. Hickin's recommendations for Mother were for her to continue counseling, continue working on issues surrounding her personality disorder, and reevaluate and reinvestigate her hearing deficit. Dr. Hickin did not recommend returning W.P. to the custody of Mother until Mother addressed her denial of the domestic violence and admitted and dealt with Father's controlling behavior.
{¶ 34} Lora Paisley testified that Mother denied any instances of domestic violence until recently. Mother admitted to Paisley that Father pinches her and hits her in her sleep, leaving bruises. Mother also stated that she would tolerate the abuse in order to get W.P. returned to her. Paisley does not believe that this is a safe environment in which to raise a child. Paisley has referred Mother to a battered women's shelter. CSB recommended joint counseling for the couple, but Father was not receptive to the idea. William Cardina, a social worker with CSB, does not believe that the environment in the home has stabilized. Cardina testified that "Ms. Porter is in danger and we feel any one-year-old child would be in danger."
{¶ 35} Dr. Hickin performed a psychological evaluation on Father. Dr. Hickin testified that he scored in the average range of intellectual functioning, but showed problems solving everyday problems. The tests revealed a great deal of anxiety and irritability over minor obstacles, low frustration tolerances, impulsive features, and exaggeration. When asked about how he met Mother, Father reported that he always wanted to be with her and now he has her. That statement concerned Dr. Hinkin because it indicates that Father did not merely enter into a relationship with Mother, rather, he obtained her or possessed her, which puts the relationship at risk for domestic violence.
{¶ 36} Father told Dr. Hickin that the charges of domestic violence which led to his conviction in March 1999 should never have been filed, and that he did not believe he hurt Mother. He indicated to Dr. Hickin that Mother looked at him in a way that reminded him of his own defiance with his parents, and this infuriated him. He also indicated that he did not know if he believed in domestic violence. Father completed anger management classes after his conviction, and stated that when he gets angry he will go for a walk to "cool off." Father testified that Mother often lies and exaggerates about the domestic violence in the home. It is Dr. Hickin's opinion that Father does not have control, even after he completed anger management classes. Dr. Hickin's recommendations for Father were that he enter counseling relating to mood and anger management and domestic violence coping skills, as well as classes on life planning.
{¶ 37} Paisley has counseled Mother once a month for the past three years. During that time, Mother has missed only one appointment. Paisley testified that Mother has been working on improving her judgment and establishing boundaries in her relationships. Paisley stated that Mother's diagnosis from Portage Path was that she suffers from a personality disorder not otherwise specified with depressant and immature features. Paisley did not agree with the diagnosis given by Dr. Hickin of NEOPA, that Mother's personality disorder included narcissistic features.
{¶ 38} Cardina testified that at the time of W.P.'s removal, CSB was concerned with the history of the couple. CSB had received previous referrals concerning Father, and CSB had previously been granted permanent custody of another child of Mother. The couple's housing has been unstable in the past, with the couple moving several times prior to W.P.'s birth. However, the couple moved only once while this matter was pending, and Cardina testified that the past two apartments have been suitable for a child. The couple left their previous apartment abruptly, without telling Mr. Hertrick, the landlord, that they were vacating the apartment. Father testified that he lied to the landlord and told him the rent check was in the mail when he knew that it was not. Father explained this by saying he lost his train of thought and instead of telling Hertrick they were moving out, he told him that the rent check was in the mail. Hertrick testified that he had problems with Mother and Father missing payments and making late payments. Hertrick obtained a judgment in Barberton Municipal Court against the couple in the amount of $2165 for unpaid rent, late fees, and damages.
{¶ 39} W.P. has been living with his foster caregivers, Mr. and Mrs. Morlan, since he was four days old. The Morlans have provided for all his needs, including caring for him when he underwent surgery for pyloric stenosis at the age of five months, and recently when he had tubes inserted in his ears. The Morlans wish to adopt W.P. if CSB is granted permanent custody.
{¶ 40} Mother and Father have been consistent in their visitations at the CSB visitation center and have only missed their scheduled visits when W.P.'s foster caregiver was on vacation. Margaret Campbell, a CSB case aide, has closely supervised the visits at the CSB Visitation Center between W.P. and Mother and Father. She testified that Mother has problems stimulating W.P. and performing tasks such as putting on his coat and snowsuit. Campbell stated that Mother has to be told everything. Campbell further testified that Mother is not watchful of her hearing aids batteries, that she turns her hearing aid down at times, which concerns Campbell because Mother may not hear the child. Father is appropriate with W.P., gives him bottles, and changes his diapers; however, Campbell testified that the couple does not interact with W.P. together, rather, they interact with him one at a time. Campbell also related instances in which Father was rude to Mother, making harsh and inappropriate comments to her while in Campbell's presence. However, Campbell noted this behavior has stopped in the past few months.
{¶ 41} Both Campbell and Mrs. Morlan, W.P.'s foster caregiver, testified that W.P. has no separation anxiety from Mother and Father at the end of the visits. W.P. is quick to go to his foster caregiver, Morlan when she picks him up. W.P. is beginning to refer to Morlan and her husband as "mama" and "dadda." Morlan believed that Mother and Father are happy to see W.P. at the visits. W.P. is ready to go when she picks him up.
{¶ 42} Sharon Sciartelli, W.P.'s guardian ad litem, reported that W.P. is healthy and developmentally on target. Any medical concerns have been addressed promptly and effectively by his foster caregivers. Sciartelli noted that Mother and Father have completed several of the tasks set forth in the case plan; however, she also reported that it is unclear if the participation in the various programs had resulted in any meaningful changes in the home environment. Sciartelli pointed to concerns regarding providing a home that is free of abuse and neglect and that is stable and safe. She believes the couple's personal characteristics, attitudes and behavior patterns led to the domestic violence and financial and housing troubles. She further stated that this is unlikely to change, and the case plan requirements will not be met anytime soon. She noted Mother's cognitive and emotional limitations, immaturity and impulsiveness, poor judgment, insight, and decision-making skills, poor parenting skills, and her inability to keep herself safe. Sciartelli also referred to Father's behavior in blaming others for his difficulties and refusing to take responsibility for his own actions. Sciartelli believes that Father does not participate in programs requiring an extended effort or change on his part. Sciartelli reported that W.P. is in need of a permanent, safe, and stable home environment, and she recommended that W.P. be placed in the permanent custody of CSB.
{¶ 43} With respect to the finding as to whether W.P. cannot be placed within a reasonable time or should not be placed with the parents, the juvenile court found that Mother, because of chronic mental or emotional illness, mental retardation, physical disability, or chemical dependency, is unable to provide an adequate permanent home for W.P. at this time and, as anticipated, within one year. The court further noted that Mother had her parental rights involuntarily terminated with regard to a sibling of W.P. in 1999. The court found that Father has repeated failed to substantially remedy conditions which caused placement outside the home and he has failed to demonstrate the ability to appropriately parent the child. The court also addressed the history of Father's domestic violence against Mother. While the court noted that the couple complied with their respective case plan objectives by completing a thirteen-week parenting class and regularly attending supervised visitations with W.P., the court also noted that the couple failed to recognize the potential for domestic violence in the home. The court found that Father had not been receptive to counseling for mood or anger management and domestic violence coping skills recommended by Dr. Hickin, nor was Father receptive to joint counseling with Mother as recommended by CSB.
{¶ 44} Given the testimony and the evidence presented, we cannot say that the trial court erred in finding, by clear and convincing evidence, that W.P. cannot be placed with either parent within a reasonable time or should not be placed with either parent.
{¶ 45} Although Mother does not directly challenge this prong of the statutory test, she asserts that the grant of permanent custody to CSB was erroneous because she substantially complied with her case plan. Substantial compliance with a case plan, in and of itself, does not prove that a grant of permanent custody to an agency is erroneous. In reWatkins (Aug. 30, 1995), 9th Dist. No. 17068. R.C. 2151.414(E)(1) "indicates that if the agency conducts `reasonable case planning and diligent efforts' to assist the parents in resolving the conditions which caused the initial removal of the children and the parents fail to substantially remedy those conditions, then the court is required to find that the child cannot be placed with the parents within a reasonable time." In re Jones (Apr. 17, 2002), 9th Dist. No. 20766. See, also, R.C.2151.414(E)(1). R.C. 2151.414(E) does not require the agency to use reasonable and diligent efforts in all cases. In this case, the juvenile court found that Mother's parental rights were terminated concerning a sibling of W.P. Therefore, R.C. 2151.414(E)(11) applied to Mother in addition to any other factor under R.C. 2151.414(E). Because there was an additional basis under R.C. 2151.414(E) upon which the trial court determined that W.P. could not be placed with Mother within a reasonable time or should not be placed with Mother, we need not consider the effect of Mother's compliance with the case plan and the application of R.C.2151.414(E)(1). See In re Jones, supra.
{¶ 46} In considering the best interests of W.P., the court found that W.P. is in need of a legally secure permanent placement, and such placement cannot be effectuated without a grant of permanent custody to CSB. The court found it is in the child's best interest to be placed in the permanent custody of CSB. In making this determination, the court relied on the recommendations of the guardian ad litem, who recommended permanent custody be granted to CSB. The court also discussed the relationships between W.P. and his parents and foster caregivers, and the fact that Mother's parental rights were terminated with regard to a sibling of W.P. Clear and convincing evidence exists to support the trial court's determination that the grant of permanent custody to CSB was in W.P.'s best interest. Therefore, we cannot say that the trial court erred in its decision.
{¶ 47} Given the testimony before the juvenile court, we cannot say that the court erred and created a manifest miscarriage of justice when it terminated Mother's and Father's parental rights and awarded permanent custody to CSB. Mother's three assignments of error and Father's sole assignment of error are overruled.
 III.
{¶ 48} Having overruled the assignments of error, we affirm the judgment of the Summit County Court of Common Pleas, Juvenile Division.
SLABY, P.J., WHITMORE, J. CONCUR.
[1] We note that the magistrate's decision refers to two additional witnesses, Cynthia DeVane and Judith Allen. However, the transcript of proceedings that was filed with the trial court contains no such testimony. We further note that several exhibits referred to in the transcript and in the magistrate's decision are not a part of the record before us, and some exhibits that are in the record are not referred to in the transcript, or are referred to as different numbers. Moreover, the transcript of the permanent custody hearing does not contain a motion on behalf of the state to admit the state's exhibits into evidence. It is also evident upon review of the transcript that some exhibits were missing at the conclusion of the hearing. The magistrate allowed the parties seven days within which they could file the exhibits, yet the record and docket contain no such indication that these missing exhibits were ever filed with the court. The trial court does not refer to any of the exhibits in its judgment entry; therefore, we assume that the record before the trial court is the record we have before us.